We'll hear the next case, United States v. Stevens. Good morning, may I proceed? Troy Stevens raises two challenges on this appeal. One, that the restitution order was invalid, and the second one, that the guideline loss was overstated. And I believe there's one common flaw that runs through both of the district court's determination, which is that at all times throughout, the property was collateralized by a mortgage, and it was that mortgage which compensated the victim. This collateral is directly relevant to the loss calculation, based on the commentary in two… How did that collateral compensate Kinpert? It didn't have to compensate Kinpert. It had to compensate the victim. This was a bank fraud prosecution. The victim was the bank. That's the name of the prosecution, and it is bank fraud. If somebody puts a mortgage on my house on a lien, they're defrauding the bank, but they're also injuring me. They may be, Judge Winter, but for purposes of both restitution statute and the guidelines, while you would be out, you wouldn't be the victim for the purposes of those statutes. I'm sorry? Offhand, I don't, but this is not a wire fraud prosecution. This was bank fraud. The only victim in the bank fraud is the bank itself. Kinpert steps into the shoes of the bank for purposes of restitution because it paid the loan back? Is that not true? No, Judge Shin, because here, regardless of what Kinpert did, the bank always had this collateral. They had the collateral from the moment the loan was taken out, and to the extent that Kinpert is viewed as giving anything, what they got in return for that… That's exactly why I question why Kinpert is not a victim, because your argument is the bank's fully protected because it can take money from Kinpert. They may be a victim in the colloquial sense. They were certainly out of money. There's no question about that, but the question is there's a specific offense of conviction here, and the offense of conviction in this case was bank fraud, and the only victim of that… The government, in its brief, concedes that Kinpert itself was not a victim. But why isn't Kinpert a third-party compensator under the statute for purposes of restitution? Because they got in exchange for that… To the extent they're viewed as paying out anything, they got in exchange for that a release. In essence, there was an exchange. They paid money to the bank, and the bank released the mortgage. One of the district court, in rejecting Stephen's argument, reasoned this is at 372. Kinpert could easily have decided, having already sold the property and given that the defendant was already on the hook for the fraud, to have just walked away with the $10 million. That was wrong because they never had $10 million of cash in their pocket. As soon as the property was sold, the first person that was paid was the bank. What happened then in the law was an exchange. We gave you cash. We got the release of the lien. For purposes of the restitution… When the settlement was entered into and the parties exchanged the releases in the agreement, everyone knew about the fraud, right? Everybody knew about the… Stephen hadn't been sentenced yet, but it was all on the table in that sense. Yes, and it was specifically discussed in the release. That's another problem with one of the district court's findings. When the district court says, oh, there was nothing that required, under the settlement agreement, to pay the bank, that's simply wrong because the settlement agreement acknowledged the existence of this foreclosure action, released. This is at A182, where it acknowledges the existence of the foreclosure action, and then at A184, it specifically releases Stephens from that action. When the loan was originally made, I guess it was renewed a number of times, did the money go to Stephens or did the money go to Kinty? I believe the money went initially to Kinty. There was an allegation by the government that at least some of this money then was diverted to Stephen, went into his pocket. There's at least $1 million, which is another basis why the district court's findings were wrong because one of the things that the district court said was, oh, there's all these other losses that Stephen caused, and therefore you can't use the settlement agreement to offset it. Well, some of those losses were, for example, the $1 million that went from the bank to Kinty to Stephens. You can't say, oh, compensate him for taking out the money and then compensate him also for taking the money twice. That's $2 million, so that's $1 million. So that's just another— If we can get to the second point, the loss calculation. There's an appeal waiver. Why doesn't the appeal waiver preclude your client from pursuing this argument? Because, one, we're talking about here a finding, a loss finding of 18 levels that was inapplicable. A lot of this—I've cited the authority in my brief. The appeal waiver doesn't apply because it's a big mistake? Well, there is a doctrine of miscarriage of justice, and I think if there is such a—if the doctrine would apply—if it should apply, it should apply in a case like this. What about where, on both sentencing hearings, his lawyer was specifically asked, Mr. Conway, whether your client agrees with the calculation of intended loss and specified the guideline range, and he said, on both occasions, we agree. We agree with that calculation. Will you just ignore that? I think it shows that the lawyer was ineffective because we're not talking about something esoteric. We're talking about a black-and-white commentary guideline specifically applicable to the facts of these cases. The quote, in a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of the sentencing has to be offset. There can't be anything clearer than that. I think the lawyer may have just missed it, but that's another reason why this Court shouldn't enforce the waiver because I think it's just—it's clear inference that— Does it matter that it was intended loss? No, it doesn't. We cited authority. We cited two cases, United States v. Shield, United States v. Nichols. They are 10th Circuit cases, but we cited other authority as well. It would offset intended loss also. This is not—when you—and I—it's—Shield says clearly when you give—when you have collateral, the bank has this asset, it doesn't make—it offsets an intended loss the same way it offsets an actual loss. This is not a situation—the government seems to equate this as the fraud being discovered and the defendant comes in and pays down the loss. Now, the guidelines recognize you can't offset that. It's too late. But this is—from the second the loan was taken, the loss—the bank had the collateral. They had—they were over-collateralized, and therefore, they were fully compensated. So I think this is a case—yes, there is an appeal waiver, but when you're talking about such a dramatic error, I think it just can't be ignored, whether it's as a miscarriage of justice or that the plea was just not knowing and voluntary, if he took the plea based on that advice. Thank you. We'll hear from the government. May it please the Court, good morning. My name is Martin Coffey, and I represent the government. An important fact that needs to be emphasized and reemphasized is that the collateral here really wasn't collateral. There was a defective pledge of collateral from the outset, and it was a defective pledge of collateral because Stevens lacked authority to post and pledge the collateral. He needed the approval of the other partners, which he did not obtain. Yes. Yes. Yes, Judge Winter is wrong. Yes. Yes, Bankford can have a third party as a victim. And— Yes, correct, Your Honor. But— I have 40 points before we move any further. But even if it's a defective opposing of collateral, it's still—the owner of the collateral still is suffering a loss. Yes. And here, under the Thompson decision of this Court, Kinpit is really a provider of compensation in the way this Court has defined it. They could be a victim, too, and are. But the first victim is the bank, because the bank was pledged collateral that, in the end, if they had litigated it, there would have been a dispute over whether or not there was a legitimate pledge of collateral or was it a defective pledge because Stevens lacked the authority and the consent of his partners to pledge that collateral. Even assuming that's all true, there was a civil litigation. They entered into a settlement agreement. Mr. Stevens gave up his 50% interest in the partnership. The partnership had some value. The properties were worth $10 million. And they signed—they gave each other general releases. Why does that not preclude a subsequent restitution award? It would lead to the odd and inequitable result that he looted the partnership. So he looted the partnership of $11 million separate and apart from the bank fraud of $5 million. And even assuming that's true, that's not related to the crime of conviction, isn't it? No, it is not related to the crime of conviction. So the Court can't award restitution based on fraud that's unrelated to the crime of conviction, correct? Correct. The Court, though, did not expand the restitution. The District Court— But in terms of—what I'm hearing is they had a settlement, but because there were these other claims of fraud, the District Court was entitled to award restitution in this case, even though the crime of conviction related only to the Capital One bank loan. That's not the position. The position is, as a provider of compensation, Kinpit should have been given the restitution. The argument then was advanced in the District Court that, well, he should be given a— Suppose it was given restitution already, in effect. In other words, if it was already compensated for its injuries before you got to the sentencing, then would it be entitled to restitution again? The Kinpit you're talking about? The Kinpit I'm talking about. No, they would not if they had gotten—if they had taken— But on these facts, doesn't it sound like Kinpit was already compensated for its injury that flowed from paying the Capital One bank loan? Well, what they were trying to do is they were trying to get an offset that's not provided for in 3664J1 to a provider, to the defendant, to offset the loss or the restitution amount. He was looking for an offset, and the way the District Court got into the subject matter of other losses was not to say that should be part and parcel or somehow connected to the restitution. The District Court got into that discussion because he was looking for an offset because I released my share of the partnership in the building. But the District Court was saying that would lead to an inequitable, unjust result because you did— But if some of the compensation that he gave up went to reimburse Kinpit for paying off the Capital One loan, shouldn't he be receiving a credit for that at the sentencing in terms of the restitution calculation? As a matter of equity, I don't see it in the statute as it— there being a specific offset provision like there is in the sentencing guidelines for an offset for collateral held. As a matter of equity, does that not make sense? Given also de facto that this was collateral that was not really collateral, he was relinquishing his share of a partnership, but he engaged in fraud on two fronts. He posted that collateral as collateral, which he did not have the authority to do, and then he simultaneously was defrauding the partnership of $11 million. So the partnership is left with a choice. Do we deal with the $11 million and try and pay that loss, or do we pay the bank? So they took the high road and paid the bank. You would agree that Kinpit would not be entitled to double payment? Correct. I agree. Why is it not double payment if they were given something when Stevens released his interest in the partnership? They were given something on account of the loan, and now he's being ordered to pay the full amount of the loan again. Why is that not a double recovery? Well, he profits by his wrong then. He, as the perpetrator of a wrong on two fronts, gets to satisfy himself by not having to pay the bank loan. And can the district court do that analysis and say he profited by two wrongs? Because one of the wrongs is not the conviction in question. Correct. I agree. One of the wrongs was the $11 million not in the count of conviction. Can the district court factor that in? Only to rebut the argument that he's entitled to an offset. She was addressing, the district court was addressing the fact that the 3664, Jay trying to craft on some kind of an offset to that provision. If it's kept strictly to the premise that principle that as a provider of compensation, Kinpit should be given the payment that it made, should be given as restitution, the payment that it made to the bank, that analysis should stop there. But they tried to advance that and craft onto 3664J1 more than that by saying that he was entitled to credit for giving up his share of the partnership. How much was his share of the partnership in Kinpit worth at the time of his settlement agreement? The value of the building was assessed in the sale at $10.3 million. 50% was Stephen's share and 50% was the Kinpit partnership. And how much, though, in liens was on that building at the time? How did it be paid back? The lien was the bank's lien of $5.2 million because there were six loans. The restitution was less for $4.8 million because the counterconviction did not include the sixth loan. It only included five of them that had been merged into one loan. So the analysis the district court engaged in did not expand restitution to include the $11 million. It did not expand restitution- And there were no other liens. By giving up his 50% interest, in essence, he was giving up the $5 million loan. In essence, he was paying that back. Or he could have been giving it up with the choice being left to the partnership to decide how to use his 50% share. They did not have to pay the bank. They could have paid or satisfied the $11 million in other losses, some of which included costs that he incurred in obtaining the loans and costs attendant to those loans, legal fees, foreclosure fees. So the settlement agreement did not direct the partnership how to spend his 50% share, which he relinquished. How much cash did he take out from the refinancing? Was it around $6 million? $5.2 million he took. $5.2 million? Yes. How many did he take out for himself? Is that the question? Yes. For himself? For himself, the best we were able to ascertain is he took the $5.2 million in its entirety because he- Did he make a representation, a statement in the district court that it was in the high six figures that he kept for himself? I don't remember that statement, Your Honor, but the $5.2 million was traced and found to be, for example- Did that go to Kinpit or did that go to him? That's the question. The $5.2 million goes into a Kinpit operating account from which he takes, loots the money. For example, from that account, he issued himself a $1 million check. From that account, he puts $400,000 and then takes that out, so he's looting the Kinpit account. And that money wasn't recovered? The money was not. The money he took out, kind of simple, he took cash out and he paid himself and he didn't tell anybody else in Kinpit he was doing this. That's kind of the whole case, right? Yes. And he was taking cash out of these refinancings and putting them in his own personal pants pocket, right? Yes, Your Honor. How much was that? $5.2 million, as best we've been able to trace. Were you able to recover any of that from money he just stole and then spent on other things? No, Your Honor. That was gone? That was gone, spent. So, if there are no other questions, Your Honor, I'll stand on the government's brief. We'll hear the rebuttal. First, I just want to go back to Judge Winter's question. A victim is defined under 3663, capital A, A1-2, means a person directly and proximately harmed as a result of the commission of an offense for which restitution is ordered. I'm looking at page 28. Taking acts that cause someone to put a lien on person A's property is an injury to A, even if it's a fraud on the person who put the lien on. Judge Winter, I'm looking at the government's brief. This is page 28. The Kinpit partnership was not the direct and proximate victim of the scheme. I'm asking you a question. I'm not making a statement. It may be inconsistent with the government's brief. I just— Okay. But I do not see how, when a bank fraud causes a lien to be put on someone's property, that someone does not become a victim. I can see how they're not—that the losses to the other defamations are not part of the bank fraud, but I don't see why this mortgage on the principal asset of the partnership is not an injury to the partnership. I agree it is an injury to the partnership. The question is whether it has to be prosecuted under a different offense or whether that's what Stevens was prosecuted for here. Just to go back to another point about that it was a defective pledge of collateral, under New York state law, under New York partnership law, it was, vis-à-vis the bank, good collateral that they could collect on. As far as how much was taken, there's no evidence that all $5.2 million, I don't believe was traced, went into Stevens' pocket. The government constantly talks about a million dollars that went, and we're not disputing that. As far as the $5 million, I think it went to Dormich, which used it for repairs to the property, for the management of the property. You're disputing that $5.2 million went to Mr. Stevens? To Stevens' pocket, yes. You admit that perhaps a million did? Yes, yes. Okay. Thank you. Thank you. We'll reserve the decision.